ATTORNEY FOR THE RESPONDENT
Frederick B. Ettl
South Bend, Indiana

ATTORNEYS FOR THE INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
Seth T. Pruden, Interim Executive Secretary
Indianapolis, Indiana

# In the
# Indiana Supreme Court

FILED

Apr 01 2010, 1:20 pm

CLERK
of the supreme court,
court of appeals and
tax court

No. 71S00-0811-DI-608

IN THE MATTER OF:

RODNEY P. SNIADECKI,

*Respondent.*

Attorney Discipline Action
Hearing Officer Christine Talley Haseman

**April 1, 2010**

**Per Curiam.**

This matter is before the Court on the report of the hearing officer appointed by this Court to hear evidence on the Indiana Supreme Court Disciplinary Commission's "Verified Complaint for Disciplinary Action," and on briefing by the parties. Respondent's 1992 admission to this state's bar subjects him to this Court's disciplinary jurisdiction. See IND. CONST. art. 7, § 4.

We find that Respondent, Rodney P. Sniadecki, engaged in attorney misconduct by violating the terms of a previous suspension from the practice of law, by entering into an improper business transaction with a client, and by committing crimes and engaging in dishonest conduct that is incompatible with the privilege of practicing law in this state. For this misconduct, we find that Respondent should be disbarred.

# I. Background

At relevant times, Respondent practiced law as a sole practitioner in Mishawaka and South Bend, Indiana. On November 20, 2008, the Disciplinary Commission filed its Verified Complaint consisting of three counts. The final hearing was held over a period of six days. Twenty-nine witnesses testified, resulting in 1,800 pages of trial testimony. Hundreds of pages of documents were presented as exhibits. The hearing officer filed a 75-page report containing detailed findings of fact ("Report"). Respondent filed a petition for review on March 2, 2010, by which he incorporated by reference lengthy findings of fact he proposed to the hearing officer.

In his petition for review, Respondent contends that the hearing officer displayed a prosecutorial bias, ignored Respondent's evidence, misunderstood the law, and made improper evidentiary rulings. A review of the record indicates that the hearing officer was diligent and even-handed in conducting the hearing and evaluating the evidence. Her Report shows no misunderstanding of the law. Any arguable errors in evidentiary rulings are harmless in light of the overwhelming evidence of Respondent's misconduct.

Having considered the evidence, the Report, and Respondent's petition for review, the Court concludes that the hearing officer's findings are well supported by the evidence and adopts those findings of fact, except as noted in the discussion below.

# II. Respondent's Misconduct

## Count I: Failure to Obey Suspension Obligations

Prior suspension order. On October 17, 2007, this Court issued an order in a prior disciplinary case against Respondent under Cause Number 71S00-0512-DI-627, suspending him from the practice of law for six months with automatic reinstatement, effective November 26, 2007 ("Order of Suspension"). *See* Matter of Sniadecki, 875 N.E.2d 22 (Ind. 2007).

2

The Order of Suspension explicitly reminded Respondent the he was required to fulfill all the duties of a suspended attorney under Admission and Discipline Rule 23(26), which states:

(b) *Duties of Disbarred and Suspended Attorneys.* Upon receiving notice of the order of suspension or disbarment, **the respondent shall not undertake any new legal matters** between service of the order and the effective date of the discipline. Upon the effective date of the order, **the respondent shall not maintain a presence or occupy an office where the practice of law is conducted**. . . .

(c) *Duties of Suspended Attorneys.* The suspended attorney shall, within twenty (20) days from the date of the notice of the suspension, file with the Court an affidavit showing that:

(1) **All clients being represented by the attorney in pending matters have been notified** by certified mail, return receipt requested, **of the nature and duration of the suspension**, and all pending matters of clients requiring the attorney's services during the period of suspension have been placed in the hands and care of an attorney admitted to practice before the Supreme Court of Indiana with the consent of the client. . . .

(Emphasis added.)


<u>Failure to notify all active clients of his suspension</u>. Subsequent to receiving the Order of Suspension, Respondent dictated the following letter ("Stepping Away Letter") to his legal assistant of fifteen years, Sherry White ("White"), which was sent to some but not all of his active clients:

As you are probably aware, on November 26, 2007 I will be stepping away from my practice for six months. In accordance with 71S00-0512-DI-00627, I have arranged for Attorney Michael Wandling to serve as substitute counsel with regard to any legal matters you presently have pending with my office. Should you desire representation other than this, I encourage you to contact Mr. Wandling immediately and obtain alternate counsel as soon as reasonably possible. Otherwise, rest assured that your legal needs remain in good hands and Mike will take good care of you during my absence.


The Stepping Away Letter does not state the nature and duration of Respondent's suspension. Indeed, it does not disclose the fact that he was suspended, contrary to the requirement of the rule. Respondent directed White to send the Stepping Away Letter only to clients who would not care if they received it or would not understand what they were reading. Respondent therefore failed to comply with Admission and Discipline Rule 23(26)(c)(1).

3

In addition, Respondent instructed White that the office staff was not to tell clients who called he had been suspended. Instead they were to say he was unavailable and to offer to schedule an appointment with Wandling. By misleading clients about the nature of his suspension, Respondent violated Professional Conduct Rule 8.4(c), which prohibits engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

False compliance affidavit. On November 7, 2007, Respondent filed an affidavit ("Compliance Affidavit") with this Court stating:

> I do hereby affirm, under the pains and penalties of perjury, that, on November 5, 2007, I delivered to each of my current clients, a letter, via certified mailing, return receipt requested, in compliance with Rule 23 §26(c) and specifically referencing the cause number of the captioned disciplinary action. . . .

Respondent knew when he made this statement that he had not provided written notice of his suspension to all of his current clients. By knowingly submitting a false, material statement under oath to this Court, Respondent committed the crime of perjury, *see* Indiana Code 35-44-2-1, and he violated these Professional Conduct Rules prohibiting the following misconduct:

3.3(a): Knowingly making a false statement of fact to a tribunal.
8.4(b): Committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer.
8.4(c): Engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

Maintaining a presence in a law office while suspended. Prior to Respondent's suspension, Wandling occasionally covered hearings for Respondent for $50.00 each. In October 2007, Respondent hired Wandling to work as a full-time attorney. Wandling received a weekly salary from Respondent for the duration of his employment, which included the period of Respondent's suspension. Wandling did not have any authority to make changes within the law office and he did not have any supervisory authority over law office employees. Indeed, efforts he made to exert control and to make changes were thwarted by employees, who took directions only from Respondent.

Respondent never relinquished his authority over the management of the law office to Wandling. Instead, he delegated the day-to-day operation of the law office during his suspension

4

to White, telling her she was to keep the office running smoothly and to make sure the cases and hearings were covered, and the only difference during his suspension would be that he wouldn't be at the office. White managed the operation of the law office at the direction of Respondent, not Wandling.

During his suspension, Respondent maintained frequent telephone contact with law office staff, primarily White. One employee testified that Respondent called daily. Wandling testified that work was not getting done because White was "perpetually" on the phone with Respondent. Respondent's cell phone records indicate he placed calls to the law office or White's cell phone at least 675 times during his suspension. Respondent was also physically present at the law office at times during his suspension. One employee observed Respondent dictating a letter to White relating to one of his cases. While White was on vacation, Respondent came to the law office and asked this employee to print a copy of a pleading in one of his cases.

The money that Wandling generated in fees during Respondent's suspension was deposited into Respondent's business operating account. Respondent did not add Wandling to the operating account or his trust account, either as an owner or as a signatory. Instead, Respondent added White as a signatory to the operating account. Throughout his suspension, Respondent used a debit card and checks to purchase personal items with funds from the operating account. During his suspension, Respondent occasionally came to the back door of the law office and delivered money to White to deposit into the operating account. Respondent submitted evidence that he put more personal money into the firm's account than he used for personal purposes. Even if this is true, he nevertheless exercised control of the firm's operating account during his suspension.

The evidence establishes clearly and convincingly that Respondent maintained a presence at his law office during his suspension in violation of Admission and Discipline Rule 23(26)(b).

Accepting clients subsequent to Order of Suspension and representing clients while suspended. White testified that Respondent accepted new clients after his notice of suspension.

5

Documentary evidence shows he met with at least 11 new clients between the time he received the notice and the effective date of his suspension.

Less than one week prior to the effective date of his suspension, Respondent appeared as counsel for a client at an extradition hearing. Although he had represented this client in prior matters, this was a new matter. At Respondent's direction, White signed Wandling's name without his knowledge to documents filed in this case. After his suspension became effective, Respondent directed White to prepare a letter to authorities in Florida regarding this client. When Wandling refused to sign this letter, Respondent instructed White to sign it.

During his suspension, Respondent dictated a demand letter on behalf a personal injury client, who was also a relative and close friend. Respondent directed White to sign Wandling's name to the letter without Wandling's knowledge.

Respondent leased or provided office space to attorney Angela Russo, who occasionally handled matters for Respondent. During Respondent's suspension, White prepared and filed an appearance and petition for guardianship on behalf of a client, signing Russo's name to them without Russo's knowledge pursuant to Respondent's instruction that it was "okay" to file appearances on behalf of Russo.

During his suspension, Respondent met with a client at her home to discuss several pending legal matters and to have her sign papers relating to one of the matters. Respondent orally informed this client that he had been suspended and told her Wandling would be covering his cases. When she told him she did not want Wandling to be handing her cases, he assured her he would still be "keeping an eye" on them. Members of Respondent's office staff testified that no one but Respondent handled this client's cases during his suspension.[1]

The evidence is clear and convincing that Respondent undertook new legal matters between the service of the Order of Suspension and its effective date and that Respondent

---

[1] This is the client with whom Respondent entered into an improper business relationship, as charged in Count II. Respondent testified that this client was not sent a notice of his suspension because her files had already been taken over by Wandling. This contradicts all other evidence on the subject.

continued to provide legal services to clients during his suspension, in violation of Admission and Discipline Rule 23(26)(b) and Professional Conduct Rule 3.4(c), which prohibits knowingly disobeying a court order.

Forgery. Respondent does not deny that documents were drafted, affixed with forged signatures, and used in the practice of law during Respondent's suspension. The Court rejects Respondent's suggestion that White took these actions totally on her own initiative without his involvement. By directing or authorizing White, as his agent, to prepare and sign documents in the names of Wandling and Russo, including legal papers filed in courts, as described above, Respondent committed forgery, *see* Ind. Code § 35-43-5-2, and violated these Professional Conduct Rules prohibiting the following misconduct:

3.3(a): Knowingly making a false statement of fact to a tribunal.
8.4(b): Committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer.
8.4(c): Engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

False sworn statements to the Commission. During the Commission's investigation of this case, Respondent denied under oath that he received any financial benefit from having Wandling handle cases for him during his suspension. The Commission charges that in making this statement, Respondent violated Professional Conduct Rule 8.1(a), which prohibits knowingly making a false statement of material fact to the Disciplinary Commission in connection with a disciplinary matter.

Respondent knew that funds generated from legal work performed by Wandling during his suspension were going into the firm's operating account from which he made cash withdrawals and paid personal expenses. As noted above, however, Respondent submitted evidence that he deposited more personal funds into the account than he used for personal purposes. Although the receipt of Wandling's fees financially benefited Respondent's law office during his suspension, on balance, Respondent's statement may have been meant to convey his belief that he received no net personal benefit from Wandling's fees during his suspension. We cannot say that there is clear and convincing evidence that this particular sworn statement was knowingly false when Respondent made it.

7

**Count II:  Improper Business Transaction with a Client**

Prior to June 2007, Respondent operated his law practice at 228 W. Colfax, South Bend, Indiana ("Colfax Property").  Respondent owned the Colfax Property as tenant in common with a co-owner ("Co-owner").  The Colfax Property was encumbered by a mortgage debt for which Co-owner and Respondent were both responsible.

At relevant times, Respondent represented a client ("Client") on several legal matters.  In June 2007, Respondent told Client that he was purchasing property at 620 South Ironwood Drive in Mishawaka ("Ironwood Property") for use as his law office and that the Colfax Property was for sale.  During the discussion, Client became interested in purchasing the Colfax Property.  Soon afterward, Respondent and Client entered into an oral agreement for the sale of the Colfax Property to Client for $225,000.[2]  Client had no experience or expertise in purchasing real estate.  Respondent did not advise Client that he did not hold clear title to the Colfax Property, he did not put the terms of the sale of the Colfax Property in writing, and he did not advise her to seek independent legal counsel regarding her purchase.

About two days after Client agreed to purchase the Colfax Property, Respondent asked her if she could get the money quickly.  Client intended to pay cash, but she could not get the entire $225,000 as quickly as Respondent wanted it.  Client therefore borrowed $180,000 on margin from her stockbroker and gave it to Respondent as partial payment for the Colfax Property.  Respondent did not inform Co-owner about this payment.  Respondent used the $180,000 as a down payment on the Ironwood Property.

After transferring the $180,000 to Respondent, Client sought permission from Respondent to have the Colfax Property more fully inspected.  Respondent told Client that this would "ruin everything" in a tone Client found intimidating.  Client then notified Respondent that she no longer wanted to purchase the Colfax Property and requested a refund of her down payment.  All these events occurred in the space of about one week.

---

[2] There is conflicting evidence on whether the agreed price was $225,000 or $240,000, but this fact is irrelevant to the issue of Respondent's misconduct.  The agreed price will be taken as $225,000 for the purpose of this opinion.

Respondent no longer had the $180,000 Client had paid him. Client made numerous attempts to get Respondent to provide her with documentation to protect her right to repayment of the $180,000. In response, Respondent presented Client with a promissory note for this amount, but he failed to comply with Client's requests to set up a payment schedule. Respondent continued to represent Client in legal matters until she discharged him in December 2007.

By these actions, Respondent violated these Professional Conduct Rules prohibiting the following misconduct:

    1.8(a): Entering into a business transaction with a client unless the terms are fair and reasonable, the terms are fully and clearly disclosed, the client is given reasonable opportunity to seek independent counsel, and the client consents in writing to the transaction.

    8.4(c): Engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

## Count III: False Loan Documents and Attempted Obstruction of Justice

_Repayment agreement_. Shortly after discharging Respondent, Client met with attorney Andrew Nickle, who agreed to represent Client in attempting to collect the $180,000 payment she made to Respondent. In discussing the matter with Nickle, Respondent told Nickle that he would repay Client from the proceeds of the sale of the Colfax Property and would provide Client with first mortgages on the Colfax Property and on the Ironwood Property. Nickle had prepared title work on both properties, however, and told Respondent he did not have clear title to the Colfax Property and that Respondent's wife, not Respondent, was the owner of the Ironwood Property. In response, Respondent falsely stated or implied that Co-owner had no real interest in the Colfax Property. Respondent also said that the Ironwood Property was actually his even though it was in his wife's name and that he could get his wife to sign a mortgage in favor of Client.

Client agreed to accept a short-term note secured by mortgages on the Ironwood Property and the Colfax Property. On or about January 17, 2008, Respondent and his wife executed a promissory note ("Promissory Note") in favor of Client in the amount of $190,481, representing the $180,000 down payment plus interest and attorney fees, due to be paid by April 16, 2008. The Promissory Note was secured by a mortgage on the Ironwood Property signed by

9

Respondent and his wife. Respondent was unable to provide a mortgage on the Colfax Property because of Co-owner's interest in it.

False statements and documents for loan application. To repay Client, Respondent sought to refinance the Ironwood Property, which was in his wife's name. In February 2008, Respondent therefore contacted Stephen Riner, a loan originator for Landmark Mortgage known to Respondent from prior business dealings, to begin the process of obtaining a loan in his wife's name. Riner filled out an application falsely showing Respondent's wife as having a monthly salary of $15,000.[3] On April 9, 2008, Respondent's wife signed the application (according to her, without reading it). Riner submitted the completed application to a lender and provided Respondent's office with a copy of it.

Riner and Respondent expected the loan to be approved based on the value of the property and Respondent's wife's excellent credit rating. The lender, however, requested additional information regarding Respondent's wife's employment. Riner testified that he spoke with both White and Respondent about these requests. White testified that she contacted Respondent each time the lender requested additional information or documentation for the loan. Respondent repeatedly stressed to White the importance of the loan and told her to do whatever was necessary to get it closed, even when she protested. During various points in the loan application process, Respondent's wife was falsely portrayed as the CEO of Respondent's law office and as self-employed with "St. Joseph Valley Mortgage."[4] With Respondent's authorization, White completed a "Verification of Employment" falsely confirming Respondent's wife's employment with the law firm. When the lender requested corporate and personal tax returns relating to Respondent's wife's employment and income, Respondent told White to give the lender whatever was necessary, asking her to "make" the tax returns. White then used a

---

[3] Riner admits he listed Respondent's wife's monthly salary as $15,000 without knowledge of whether this was correct because he knew that was the income level required for the loan. Riner disclaims any knowledge that any documentation supporting the application was false. The Court reaches no conclusion on this point; however, even if Riner was involved in falsifying documents, this would not excuse or lessen Respondent's misconduct.

[4] Although St. Joseph Valley Mortgage Company was a real entity Respondent incorporated in his wife's name, she received no income from the company.

computer program to prepare false corporate tax returns for 2006 and 2007, purporting to be for St. Joseph Valley Mortgage and listing Respondent's wife as a compensated officer. White also prepared false personal tax returns for 2006 and 2007 purporting to be for Respondent's wife. White then provided the false returns to Landmark Mortgage.

At some point Riner told White that the lender needed a letter from the accountant for St. Joseph Valley Mortgage, which did not have an accountant. At Respondent's direction, White hired a Certified Public Accountant ("CPA"), to review the falsified tax returns and prepare a letter that would satisfy the lender. The CPA reviewed the returns and prepared a letter addressed to "To Whom It May Concern" saying that he had reviewed Respondent's wife's tax returns and that she had filed as self-employed for the past two years. The CPA was not informed of the purpose of this letter.

White also created a false loan broker license for St. Joseph Valley Mortgage and a false loan originator certificate for Respondent's wife. In addition, she altered the contents of a letter Nickle sent to Riner regarding payoff information for the loan to Client.[5] White provided these documents to Riner for use in the application process.

The president of Landmark Mortgage eventually became involved in the loan application process due to the inconsistencies in the documentation for the loan. The lender ultimately withdrew funding on May 19, 2008, because of an anonymous phone call suggesting there were falsehoods in the documentation. In a subsequent meeting with the president of Landmark Mortgage to discuss why the loan was cancelled, Respondent assured him that none of the information that had been provided for the loan application was fraudulent in any way, insisting in particular that his wife was indeed a CEO as represented.[6] Respondent obtained a loan from a relative of his wife, and he paid Client the amount due on the Promissory Note on May 22, 2008, over a month after it was due.

---

[5] Riner testified that he asked White to obtain a revised pay-off letter from Nickle and that he did not know she altered the original letter Nickle had sent.

[6] The president of Landmark testified that after this conversation, he was satisfied that the information in its file was accurate, but he had warned Respondent that if he discovered something had been altered, Landmark would reopen the case and take legal action.

11

Respondent asserts that he was in Italy while the loan documents were being prepared and unaware of the falsifications. He contends that White prepared and submitted all the false documents of her own volition out of friendship for Riner, who stood to earn a commission if the loan went through. However, other than maintaining her employment with Respondent, White stood to gain nothing for herself by fabricating the documents and exposing herself to criminal liability. Moreover, White's testimony is not the sole evidence of Respondent's culpability. The record also shows:

> ➤ Respondent was in frequent phone contact with both White and Riner during the loan application process. Respondent was in Italy for only two weeks (April 14-28, 2008) and he admits he spoke to White by cell phone during this period.

> ➤ Riner testified that he spoke not only with White, but also directly with Respondent about the lender's requests for documentation. Riner estimated he spoke directly with Respondent ten times throughout the course of the application process.

> ➤ Respondent was under pressure to finalize the loan to repay Client. When Respondent's repayment to Client was not made timely, Client's attorney started to prepare the paperwork to foreclose on the Ironwood Property.

> ➤ Riner testified that even after he decided the loan process should end due to documentation problems, Respondent insisted that it was important to continue.

> ➤ Any documentation provided by anyone to support the loan application's misrepresentations regarding Respondent's wife's employment and income could not be authentic and would have to have been fabricated.

> ➤ The president of Landmark Mortgage testified that Respondent assured him in person in late May 2008, after all the forged documents had been submitted, that none of the information provided for the loan application was fraudulent, including specifically that Respondent's wife was CEO of his law office.

Although Respondent may not have known the full extent of White's forgeries, the totality of the evidence is clear and convincing that Respondent directed White to create and falsify whatever documents were needed for approval of the loan application.[7] Respondent's argument that White would commit a series of serious crimes motivated only by her wish to help

---

[7] Finding 341 on page 69 of the hearing officer's Report says Respondent "was unaware of the false information that was being used." This, however, is contrary to every other finding on the issue, including statements immediately following in Finding 341. We conclude from the context and totality of the hearing officer's findings that the quoted statement was a scrivener's error.

her purported friend Riner earn a commission is not credible. The fact that White was deeply complicit in the fraudulent activities in no way lessens Respondent's culpability for directing them.

By the actions described above, Respondent committed forgery, *see* Indiana Code § 35-43-5-2, and violated these Professional Conduct Rules prohibiting the following misconduct:

8.4(b): Committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer.
8.4(c): Engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

Attempted obstruction of justice. The Commission initiated an investigation of a grievance against Respondent pertaining to the false loan documents. At Respondent's direction, White called Riner to ask Riner to sign an affidavit taking sole responsibility for the allegations regarding the falsified documents. Respondent told White to tell Riner that if he did so, Respondent would open a child support recovery office and put Riner in charge of the office. Riner refused to sign the affidavit.

In his proposed findings, Respondent admits he prepared the affidavit and asked Riner to sign it. He contends, however, that he did this after he discovered that the payoff information letter from Nickle to Riner had been altered and the purpose of the affidavit was for Riner to accept responsibility for this alteration. The affidavit did in fact address the alteration of this letter; however, it was far broader, stating that the lender requested "a number of documents not readily available, which I then had prepared in order to comply with the lender's request . . . for the purposes of expediting the loan . . . ." The affidavit continued: "Neither Mrs. Sniadecki or Mr. Sniadecki were . . . even aware of the existence of these documents." The Court therefore rejects Respondent's account of the events regarding the affidavit.

By creating a false document and attempting to induce Riner to sign it for use as evidence in this disciplinary investigation, Respondent committed the offense of attempted obstruction of justice, *see* Indiana Code §§ 35-44-3-4 and 35-41-5-1, and thereby violated these Professional Conduct Rules prohibiting the following misconduct:

8.4(b):  Committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer.

8.4(c):  Engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

## III.  Respondent's Discipline

The hearing officer made the following characterization of Respondent's misconduct, which we adopt:

> The nature of Respondent's misconduct goes to the very heart of the characteristics of candor and honesty that are to be maintained by lawyers.  There may be no more serious professional misconduct than to concoct false statements to the Indiana Supreme Court, forge documents to be filed in court, and to engage in criminal acts of dishonesty.  In addition to those acts, Respondent failed to protect his client in a business transaction and tried to bribe a witness in this discipline case.

> Respondent's mental state was not one of neglect or incompetence.  His mental state was purposeful, deliberate and calculated.  Respondent had many opportunities to tell the truth, but chose a different path. . . .  All of the acts proven in this case were made with thought and intent.

> The potential harm caused by Respondent's conduct is immeasurable.  His harm to the standing of lawyers and the profession by filing false documents with the Supreme Court, committing perjury and forgery, and attempting to bribe a witness is tremendous.  His potential harm to Client was over $180,000, without even considering the emotional harm to Client caused by the violations of her trust and his obligations to her as her attorney. . . .

> There are numerous aggravating factors here.  Respondent has failed to accept responsibility for his actions and still denies wrongdoing.  He has been disciplined previously for dishonesty and his conduct here is repetitive and chronic.

We add that to accept Respondent's arguments, we would have to find that nearly every witness who testified on key disputed matters, save Respondent, was lying, even those witnesses with no conceivable motive to lie, such as the president of Landmark Mortgage.  We agree with the hearing officer's assessment of the witnesses' credibility and conclude that Respondent's testimony in this proceeding was knowingly false.

14

The hearing officer recommends that Respondent be disbarred. In Indiana, disbarment permanently strips an attorney from the privilege of practicing law in the state. Disbarment is reserved for the most serious misconduct. The American Bar Association's *Standards for Imposing Lawyer Sanctions* (as amended in 1992) ("Standards") provide the following examples of misconduct warranting disbarment:

Disbarment is generally appropriate when:

(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, [or] fraud; . . . or

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

Standard 5.11.

Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement [or] submits a false document, . . . and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

Standard 6.11.

Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding.

Standard 6.21.

Disbarment is generally appropriate when a lawyer . . . intentionally tampers with a witness and causes serious or potentially serious injury to a party, or causes significant or potentially significant interference with the outcome of the legal proceeding . . . .

Standard 6.31(a).

Disbarment is generally appropriate when a lawyer . . . intentionally or knowingly violates the terms of a prior disciplinary order and such violation causes injury or potential injury to a client, the public, the legal system, or the profession . . . .

Standard 8.1(a).

15

Respondent's misconduct fits within all of the above Standards.  We therefore conclude that Respondent should be disbarred.

## IV. Conclusion

The Court finds clear and convincing evidence that Respondent violated these rules prohibiting the following conduct:

Ind. Admission and Discipline Rule 23(26):  Failing to comply with the obligations of a suspended attorney.

Ind. Professional Conduct Rules:

1.8(a):  Entering into a business transaction with a client unless the terms are fair and reasonable, the terms are fully and clearly disclosed, the client is given reasonable opportunity to seek independent counsel, and the client consents in writing to the transaction.

3.3(a):  Knowingly making a false statement of fact to a tribunal.

3.4(c):  Knowingly disobeying an obligation under the rules of a tribunal.

8.4(b):  Committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer.

8.4(c):  Engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

For Respondent's professional misconduct, the Court disbars Respondent effective May 12, 2010.   Respondent shall fulfill all the duties of a disbarred attorney under Admission and Discipline Rule 23(26).

The costs of this proceeding are assessed against Respondent.   The hearing officer appointed in this case is discharged.

The Clerk of this Court is directed to give notice of this opinion to the hearing officer, to the parties or their respective attorneys, and to all other entities entitled to notice under Admission and Discipline Rule 23(3)(d).  The Clerk is further directed to post this opinion to the Court's website, and Thomson Reuters is directed to publish a copy of this opinion in the bound volumes of this Court's decisions.

All Justices concur.